UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DWAYNE WILSON,<br><br>    Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | Case No.: 1:16-cv-01012 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF DWAYNE WILSON AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Dwayne Wilson asserts he is entitled to a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred by not developing the record and in reviewing the medical record. Because the ALJ failed to discuss significant and probative evidence in the record, the decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **BACKGROUND**

On May 31, 2011, Plaintiff filed his applications for benefits, in which he alleged disability beginning September 15, 2008. (*See* Doc. 13-6 at 2-18) The Social Security Administration denied the applications at the initial level and upon reconsideration. (*See* Doc. 13-4 at 77; Doc. 13-5 at 2-12) Plaintiff requested a hearing, and testified before an ALJ on December 14, 2012. (Doc. 13-3 at 21) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on December 21, 2012. (*Id.* at 77-84) Plaintiff filed a request for review of the

decision with the Appeals Council, which denied the request on July 23, 2014. (*Id.* at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

Plaintiff filed a request for judicial review of the decision by filing a complaint with this Court on May 1, 2014, thereby initiating Case No. 1:14-cv-00650-JLT. (*See* Doc. 13-10 at 12) The parties stipulated to a voluntary remand of the action for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). (*See id.* at 17) The parties sought remand to have an administrative law judge "further develop the record, further evaluate Plaintiff's mental impairments; further evaluate the medical source opinions of record and Plaintiff's residual functional capacity; and obtain additional vocational expert evidence if necessary." (*Id.*) Accordingly, the Court remanded the action and entered judgment in favor of Plaintiff on December 12, 2014. (*Id.* at 16, 18)

On January 27, 2015, the Appeals Council vacated the prior decision of the Commissioner. (Doc. 13-10 at 4-5) The Appeals Council noted the ALJ did not review any records from a certified nurse practitioner who treated Plaintiff, and the ALJ did not request any records "despite the fact that the claimant was unrepresented at the hearing." (*Id.* at 4) Therefore, the Appeals Council directed the ALJ to obtain additional evidence to complete the record and evaluate the expanded record. (*Id.* at 4-5) In addition, the Appeals Council directed the ALJ to offer Plaintiff an opportunity for another hearing and address evidence submitted to the Appeals Council, including treatment notes from Plaintiff's chiropractor. (*Id.* at 5, 11)

Plaintiff testified at a second hearing before an ALJ on July 21, 2015, where he "requested a closed period of disability from September 15, 2008 [t] September 13, 2013." (Doc. 13-9 at 11, 29) Following the hearing, "[t]he record was held open for two weeks for the receipt of medical records, which were received on August 3, 2015." (*Id.*) The ALJ concluded Plaintiff was not disabled and issued an order denying benefits on September 24, 2015. (*Id.* at 11-23) Plaintiff filed exceptions with the Appeals Council, which found "no reason . . . to assume jurisdiction." (*Id.* at 2) Therefore, the decision of the ALJ became the final decision of the Commissioner.

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact,

such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the

listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence**

   1.     Treatment notes

Plaintiff reported that he was in a car accident on September 19, 2011, after which "[h]e drove himself to Saint Agnes Medical Center Emergency Room, where he was evaluated" but did not have x-rays taken. (Doc. 13-8 at 16) Plaintiff "was given medications in the form of Flexeril and Vicodin and released." (*Id.*)

In October 2011, Plaintiff began receiving chiropractic care from Dr. J. Gregory Clark, reporting that following the accident he "had headaches, felt anxious and nervous, numbness in his fingers, tension in his upper back, neck pain, dizziness, lower back pain, and sleeping problems." (Doc. 13-8 at 16) Plaintiff told Dr. Clark that his head, neck, and shoulder "pain range[d] from a 2/10 at its best to an 8/10 at its worst." (*Id.*) In addition, Plaintiff said his back "pain range[d] from a 5/10 at its best to a 9/10 at its worst." (*Id.*) Dr. Clark determined ordered x-rays of Plaintiff's lumbar and cervical spine, which showed degenerative disc disease at the L4-5 with spondylosis and cervical disc disease at the C5-6 and C6-7 levels "with uncovertebral joint arthrosis at these levels with possible IVF encroachment." (*Id.* at 17) Dr. Clark diagnosed Plaintiff with a "[s]ub-acute cervical strain/sprain with an associated cervical segmental dysfunction with mild spasm and myalgia complicated with cervical spondylosis without myelopathy," "[t]horacic strain/sprain with an associated thoracic segmental dysfunction and Thoracalgia," lumbosacral strain/sprain," "A/C joint strain/sprain," and "[s]train/sprain of the shoulder." (*Id.*) Dr. Clark recommended Plaintiff "be treated at the frequency of 3 times per week for the first 4 weeks," receiving "electric muscle stimulation with heat to the shoulders and lower back," as well as manipulation. (*Id.*)

On November 18, 2011, Dr. Clark re-evaluated Plaintiff following 12 chiropractic treatments. (Doc. 13-8 at 28) Plaintiff told Dr. Clark that he continued to have pain that ranged in severity from 2/10 at its best to 8/10 at its worst. (*Id.*) Dr. Clark determined Plaintiff's cervical and dorsolumbar

ranges of motion were full, but with complaints of pain. (*Id.*) In addition, he believed Plaintiff continued to have a strain/sprain of the cervical spine, thoracic spine, lumbosacral spine, A/C joint, and shoulder. (*Id.*) Dr. Clark determined Plaintiff would "be treated at a reduced frequency of 2 times per week," receiving 'aggressive massage therapy directed to the latent trigger points in the cervical and lumbar spine." (*Id.* at 28, 31)

In April 2012, Plaintiff had an initial assessment with Ijaz Mian, LCSW, at Fresno County Department of Behavioral Health. (Doc. 13-14 at 33-37) Mr. Mian noted Plaintiff had a history "of treatment for major depression with psychotic features." (*Id.* at 37) Plaintiff reported his family had a history of mental health issues and had three of his ten siblings committed suicide. (*Id.* at 35) Plaintiff said he had suicidal thoughts, though he did not have a plan and never attempted it. (*Id.* at 34) In addition, he told Mr. Mian that he had homicidal thoughts "[e]very now and then." (*Id.*) Plaintiff told Mr. Mian he heard voices "almost daily," felt paranoid, could not be around crowds, felt depressed, could not sleep, had nightmares, did not eat, and lower energy levels. (*Id.* at 33) Mr. Mian observed that Plaintiff spoke slowly and softly, but was engaging and cooperative during the examination. (*Id.* at 36) Mr. Mian opined Plaintiff's "presentation ... [met] the DSM IV criteria for Major depressive D/O of recurrent type, severe with psychotic features." (*Id.* at 37) Mr. Mian gave Plaintiff a current GAF score of 40.[1] (*Id.*)

In June 2012, Plaintiff was "seen via telepsychiatry by Dr. Connor." (Doc. 13-14 at 30) Plaintiff told Dr. Connor that the Prozac and Seroquel she prescribed were not helping, and Plaintiff continued to have depression, insomnia, and auditory hallucinations, despite the fact that he was increasing the doses. (*Id.*) Dr. Connor and Plaintiff "discussed that escalating doses of prescription meds is considered prescription drug abuse," and she instructed Plaintiff "to not alter the dosages of his meds." (*Id.* at 32) Dr. Connor prescribed samples of Cymbalta and discontinued the prescription for Prozac. (*Id.*) In addition, Dr. Connor recommended Plaintiff participate in "[w]eekly group

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score between 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work…)." *DSM-IV* at 34.

5

psychotherapy… due to his isolativeness and lack of support network." (*Id.*) She gave Plaintiff a GAF score of 55.[2] (*Id.* at 31)

Plaintiff reported in July 2012 that he ran out of medication "a couple weeks ago." (Doc. 13-14 at 28) He said he continued to have headaches and the Seroquel did not help him sleep. (*Id.*) Cecilia Salazar, NP, observed that Plaintiff exhibited motor retardation with a blunt mood. (*Id.*) She also opined Plaintiff exhibited normal insight and judgment. (*Id.*) Ms. Salazar indicated Plaintiff's GAF score continued to be 55. (*Id.* at 29)

At follow-up appointments with Ms. Salazar in September and October 2012, Plaintiff said that he had "a hard time leaving the house" and he stayed at home. (Doc. 13-14 at 24, 26) Ms. Salazar discontinued Plaintiff's prescriptions for Remeron and Cymbalta, and added Vibryd in September. (*Id.* at 24) She noted Plaintiff did not mention having any auditory hallucinations in October, and opined Plaintiff's insight and judgment continued to be normal. (*Id.*) Ms. Salazar indicated Plaintiff had an organized thought process, but his thought content was "helpless/hopeless" with a flat affect. (*Id.*)

In November 2012, Plaintiff told Ms. Salazar that he was "doing alright." (Doc. 13-14 at 22) Ms. Salazar noted Plaintiff appeared cooperative and alert, with "soft spoken and limited" speech. (*Id.*) In addition, she opined Plaintiff continued to exhibit motor retardation. (*Id.*) Plaintiff did not mention having any auditory hallucinations, though he said he "hear[d] things at night in his house." (*Id.*) According to Ms. Salazar, Plaintiff continued to have a GAF score of 55. (*Id.* at 23)

In early 2013, Ms. Salazar noted Plaintiff reported he was "feeling depressed" and was having auditory hallucinations. (Doc. 13-14 at 20) She observed that Plaintiff had a "[t]ired appearance overall," and was "slow to respond" with "slowed thought[s]." (*Id.*) Ms. Salazar added a prescription for Zypreza. (*Id.* at 21) Although Plaintiff received referrals for "free medical treatment for [his] headaches," he did not follow-up with an appointment. (*Id.*) In addition, though she recommended Plaintiff attend individual therapy, he said he was "not interested." (*Id.* at 19) Through March 2013, Ms. Salazar opined Plaintiff's GAF score was 55. (*Id.* at 18, 20)

In April 2013, Plaintiff told Ms. Salazar that he was "feel[ing] a little better," though he was

---

[2] A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *DSM-IV* at 34.

"not sure what changed." (Doc. 13-14 at 16) Likewise, in May 2013, Plaintiff said he was doing "better than before without medication." (*Id.* at 14) Ms. Salazar noted Plaintiff did not mention having any auditory hallucinations in either April or May. (*Id.* at 14, 16) Ms. Salazar noted Plaintiff continued to exhibit motor retardation and "slowed thought." (*Id.*) Plaintiff continued to indicate he was not interested in individual therapy until May 2013, when Ms. Salazar gave him a referral. (*Id.* at 15, 17)

On June 4, 2013, Plaintiff was evaluated by Dr. Patricia Santy, who noted Plaintiff did not have medication "for the last month" because he did not know they were available for pickup at the mental health center. (Doc. 13-14 at 12-13) Dr. Santy observed that Plaintiff was "very withdrawn and responding to internal stimuli," appeared depressed and exhibited suspicious behavior with poor eye contact. (*Id.* at 12) According to Dr. Santy, Plaintiff was exhibited to person and place, but not time; and he was "currently having" auditory hallucinations. (*Id.*) She gave Plaintiff a GAF score of 48[3] and "encouraged [Plaintiff] to take his medications." (*Id.* at 13) Dr. Santy directed Plaintiff to return within two or three weeks. (*Id.* at 13)

Dr. Laila Akhabarati conducted the follow-up examination with Plaintiff on June 26, 2013. (Doc. 13-14 at 10-11) Plaintiff reported he had picked up his medication but continued to feel depressed, stating his depression was "85/100," with 100 being the "worst depression ever." (*Id.* at 10) In addition, he said he had "difficulty maintaining sleep" and was "hearing … two voices" that told him to "give up" and "hurt yourself." (*Id.*) Dr. Akhabarati opined Plaintiff's affect appeared flat and he had "poverty of thought" because he "respond[ed] to questions only." (*Id.*) She believed Plaintiff was not a danger to himself or others, but was "clearly psychotic." (*Id.* at 11) Dr. Akhabarati also gave increased Plaintiff's dose of Zyprexa and added Trazodone. (*Id.*)

In July 2013, Dr. Santy observed that Plaintiff "appear[ed] to be unchanged from the last time [she] saw him," and was "responding to internal stimuli." (Doc. 13-14 at 8) In addition, she noted Plaintiff was "somewhat disheveled and dirty," exhibiting suspicious and withdrawn behavior. (*Id.*) Dr. Santy opined Plaintiff "look[ed] very depressed and [was] very psychotic." (*Id.*) Dr. Santy again gave Plaintiff a GAF score of 48. (*Id.* at 9) She discontinued Plaintiff's prescription for Zyprexa

---

[3] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

because he had "no improvement," increased Trazodone due to Plaintiff's lack of sleep, and issued Plaintiff a trial of Risperdal. (*Id.*)

Plaintiff returned to the Community Mental Health Center on October 1, 2013, which was after he had returned to work as a substance abuse counselor. (Doc. 13-14 at 6; *see also* Doc. 13-3 at 35) Dr. Santy opined Plaintiff's condition was "unchanged from [his] last visit 2 [months] ago." (Doc. 13-14 at 6) She noted Plaintiff "ran out of sample medications and did not know he was supposed to come back and get more." (*Id.*) Dr. Santi believed Plaintiff was "responding to internal stimuli," with "poor eye contact," slowed and monosyllabic speech, and a "depressed/almost completely flat" mood. (*Id.*) Dr Santy diagnosed Plaintiff with major depressive disorder, recurrent, severe with psychotic features; post-traumatic stress disorder; and schizoaffective disorder (rule out). (*Id.*) She gave Plaintiff a GAF score of 48. (*Id.* at 7)

In November and December 2013, Dr. Santy observed that Plaintiff was "more interactive," and noted Plaintiff reported he was doing "better." (Doc. 13-14 at 2, 4) In December, Plaintiff said he thought the medication "helped" and while he still had auditory hallucinations, they were "much decreased." (*Id.* at 2) Dr. Santy noted Plaintiff "continue[d] to look depressed and as if he [was] responding to internal stimuli at times," but Plaintiff denied this. (*Id.*) Dr. Santy indicated Plaintiff's "eye contact [was] better," and he had normal motor activity. (*Id.*) Dr. Santy opined Plaintiff showed "continued improvement," but again gave Plaintiff a GAF score of 48. (*Id.* at 2-3)

2.  Medical Assessments

Dr. Sarah Song performed a consultative orthopedic examination on June 27, 2011. (Doc. 13-8 at 2) Plaintiff reported he had been in a car accident about 10 years before "where he was rear-ended on the left side." (*Id.*) He stated that he had back pain if he bent over or squatted, and the pain increased with any activity. (*Id.*) He also told Dr. Song that he had pain for about ten years in the bottom of his feet, which "hurt very much and intermittently … tingle." (*Id.*) Plaintiff said he tried "over-the-counter orthotics but they did not help much." (*Id.*) According to Dr. Song, Plaintiff "ambulated with small steps without difficulty" and "was able to stand on his toes and on his heels." (*Id.* at 3) She found Plaintiff had a limited range of motion in his lumbar spine, discomfort with flexion, and "[m]inimal tenderness to palpation along the mid to lower lumbar region on both sides."

(*Id.*) Dr. Song determined Plaintiff's strength was "5/5" in his hands, and she found "[n]o evidence of muscle atrophy" upon the neurological examination. (*Id.* at 4-5) Dr. Song concluded Plaintiff could "lift and carry 50 pounds occasionally and 20 pounds frequently;" "stand and walk six hours out of an eight hour day with normal breaks;" "sit without restriction;" and "perform postural activities such as stooping, crouching, and crawling on a frequent basis. (*Id.* at 5)

On July 9, 2011, Dr. Ekram Michiel performed a psychiatric consultative evaluation. (Doc. 13-8 at 8-11) Plaintiff reported he felt as though people were "coming after him," and he "started to hear voices" about eight years before the examination. (*Id.* at 8) He told Dr. Michiel he saw "shadows moving, black and white" at night, and he felt "very nervous around him." (*Id.*) In addition, Plaintiff reported he did not eat, had "[n]o interest or motivation," angered "very easily," and was "always shaky and afraid of people." (*Id.*) Plaintiff's girlfriend, who attended the examination with him, said that he would "sit[] and stare[] at the blank tv." (*Id.*) Dr. Michiel observed that Plaintiff's "[a]ffect was slightly intense," and he "kept intermittent eye contact throughout the interview." (*Id.* at 10) He opined Plaintiff's "attention and concentration was fair," but his short-term memory was poor and immediate recall was impaired. (*Id.*) Dr. Michiel determined Plaintiff's "[t]hought process was goal-directed" and his "[t]hought content was not delusional," as Plaintiff did not exhibit any "response to internal stimuli" during the examination. (*Id.*) Dr. Michiel diagnosed Plaintiff with "Psychotic disorder NOS" and gave him a GAF score of 50-55.[4] (*Id.*) Dr. Michiel concluded Plaintiff was "able to maintain attention and concentration to carry out simple job instructions;" and he was "able to relate and interact with coworkers, supervisors and the general public." (*Id.* at 11)

On May 24, 2012, Dr. Tawnya Brode reviewed the record of Plaintiff's mental impairments, which at the time included the consultative examination. (Doc. 13-8 at 14) Dr. Brode noted Plaintiff stated "his mental stability [was] questionable at times," but his "limits appear[ed] more physical in nature." (*Id.*) Dr. Brode concluded Plaintiff was able to perform simple, repetitive tasks with limited public contact. (*Id.*)

On May 25, 2012, Dr. R. Mitgang reviewed the medical record concerning Plaintiff's physical

---

[4] A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *DSM-IV* at 34.

9

impairments—which did not include the chiropractic records—and noted the consultative examination was "essen[tially] neg[ative], although there was some decr. of lumbar flexion and he had flat feet." (Doc. 13-8 at 14) Dr. Mitgang concluded the record did not include "evidence of a severe physical impairment." (*Id.*)

**B.    Administrative Hearings**

1.    December 14, 2012

Plaintiff testified he completed four years of college and had a degree in Liberal Arts. (Doc. 13-3 at 25) He reported that he worked as a substance abuse counselor, which included one-on-one counseling, group counseling, and community activities. (*Id.* at 25-27) Plaintiff said he was "asked… to resign" in 2008 due to "a case pending in court." (*Id.* at 25-26)

He believed he was no longer able to work because he suffered from headaches, a psychotic disorder, back pain, and foot pain. (Doc. 13-3 at 27) Plaintiff said he had "a knot on [his] head," and got headaches twice a week, for which he took over-the-counter Ibuprofen. (*Id.* at 27-28) He also took Ibuprofen for his foot pain, but did not believe it helped. (*Id.* at 28) Plaintiff stated he did not have insurance and did not "know what else to take." (*Id.*)

Plaintiff reported he took medication each day for a psychotic disorder, which made him "hear things… [a] couple times a week." (Doc. 13-3 at 30, 31) He said the voices told him "to give up" and "to go get high." (*Id.* at 32) Plaintiff said he had been sober since 1999, and had not attempted suicide. (*Id.* at 29, 31) Plaintiff reported that he went to a mental health therapist, who said he "had depression." (*Id.* at 31) When asked if he was depressed, Plaintiff responded, "Probably." (*Id.*) Plaintiff explained he did not "want to do anything." (*Id.*) Plaintiff said he was attending therapy once a month that helped "[a] little bit" because it provided "a chance to talk to somebody." (*Id.*)

He reported that he did not want to be "be around any but [his girlfriend]." (Doc. 13-3 at 32) Plaintiff stated he spent his days "[i]n the house" and only left when he had to for appointments or going to the grocery store. (*Id.*) He explained he was "a little paranoid" and "very uncomfortable being around large crowds of people," so he did not go out by himself. (*Id.* at 32-33)

2.    September 28, 2015

As an initial matter at the hearing, the ALJ observed that "the Appeals Council in the remand

order mentioned development of the record," and he did not "see that was done." (Doc. 13-9 at 31) The ALJ noted there were "no psychiatric treatment records in the file," and inquired whether Plaintiff's counsel had these records. (*Id.*) Plaintiff's counsel responded that the records had been ordered and were "supposed to be in …in a week or two." (*Id.*) In addition, counsel noted Plaintiff had returned to work in September 2013 and requested a closed period of disability, ending September 13, 2013. (*Id.* at 31-32) The ALJ informed counsel that he planned to order a consultative examination, but in light of the closed period there was "no reason to order a CE." (*Id.* at 32) The ALJ also stated he would "hold the record open for [the] additional records" to be provided. (*Id.*)

Plaintiff testified that he was unable to work during the relevant time period due to mental issues, for which he received treatment from Behavioral Health. (Doc. 13-9 at 37) Plaintiff said he had some auditory hallucinations and slept "[m]aybe five" hours each night. (*Id.* at 42) Plaintiff reported he took Prozac, a sleep medication, and Zyprexa. (*Id.* at 37-38) Plaintiff said he "had problems a little bit" with the medication and said he "didn't really want to do nothing" because of it. (*Id.* at 38)

He said he also had difficulty concentrating and "problems remembering things like [his] birthday and [his] kids' birthday[s]." (Doc. 13-9 at 41) Plaintiff testified he could follow "a set of simple instructions if someone gave them… [o]nly if [he] did it right away." (*Id.* at 41) Plaintiff estimated he would be off task for "like 10" percent of a workday if "trying to focus on a simple job back then." (*Id.* at 49) He reported he sometimes had problems with indecisiveness. (*Id.* at 41) In addition, Plaintiff said he "didn't want to be around people," and isolated himself. (*Id.*) He stated that he did not go outside or do household chores, because his girlfriend would "come and cook," as well as take care of his laundry, paying the bills, and grocery shopping. (*Id.* at 42-43)

He reported that during the relevant time period, he also experienced back pain "[t]wo or three times a month," for which he took Ibuprofen. (Doc. 13-9 at 40) Plaintiff said the medication did "[n]ot really" help, so he "would use a heat pad and lay on the floor." (*Id.*) Plaintiff testified he had issues sitting and walking, and estimated he could sit "[m]aybe three or four hours" before he needed to stand and walk one block. (*Id.* at 45) He also estimated he could lift "[m]aybe 10 pounds." (*Id.*)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ found Plaintiff did not engage in substantial activity

11

during the closed period from "September 15, 2008, the alleged onset date, to September 13, 2013." (Doc. 13-9 at 13) Second, the ALJ determined Plaintiff "has the following severe impairments: lumbago, depressive disorder, and history of schizophrenia." (*Id.*) At step three, the ALJ found these impairments did not meet or medically equal a listed impairment. (*Id.* at 14-15) Next, the ALJ found:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567 (c) and 416.967 (c), including lifting up to 50 pounds occasionally and 25 pounds frequently; standing or walking for six-to-eight hours; and sitting for six-to-eight hours in an 8-hour workday, with the following restrictions: he can perform simple and routine tasks in a non-public setting.

(*Id.* at 15) With this residual functional capacity, as well as Plaintiff's age, education and work experience in mind, the ALJ found "there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform." (*Id.* at 21) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 21-22)

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ had a duty to develop the record and erred in weighing the medical evidence. (Doc. 22 at 9-11) In addition, Plaintiff asserts the ALJ's residual functional capacity is not supported by substantial evidence. (*Id.* at 12-15)

### A. Duty to Develop the Record

A claimant bears the burden to provide medical evidence that supports the existence of a medically determinable impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *see also Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("At all times, the burden is on the claimant to establish her entitlement to disability insurance benefits"). As the Supreme Court explained, it is "not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Bowen*, 482 U.S. at 146 n.5.

The law imposes a duty on the ALJ to develop the record in limited circumstances. 20 C.F.R § 416.912(d)-(f) (recognizing a duty on the agency to develop medical history, re-contact medical sources, and arrange a consultative examination if the evidence received is inadequate for a disability determination). Accordingly, the duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2201); *see also Tonapetyan,* 242 F.3d at 1150

("[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry").

If the duty is triggered, the ALJ must "fully and fairly develop the record and to assure the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

> The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant. When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts ... The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests.

*Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations and quotation marks omitted).

Plaintiff contends, "If an ALJ receives additional evidence never reviewed by a medical expert that requires medical judgment to interpret, the ALJ is obliged to develop the record by obtaining an updated opinion from a medical expert." (Doc. 22 at 10, citing SSR 96-6p) Plaintiff observes that "[a]n ALJ is not a medical expert," and "lay opinion regarding additional medical evidence that requires medical interpretation is not substantial evidence." (*Id.,* citing *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975); *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006)) Accordingly, Plaintiff argues that "when an ALJ's residual functional capacity finding … is based only on the ALJ's lay interpretation of newly-submitted medical evidence, such RFC is based on insubstantial evidence." (*Id.* at 10-11, citing *Nguyen v. Chater*, 172 F.3d 31, 36 (1st Cir. 1999))

In response, Defendant argues an "ALJ has no affirmative duty to seek review by a medical expert or consultant of additional medical evidence submitted after the hearing." (Doc. 22 at 12-13, citing 20 C.F.R. § 404.1512) Defendant asserts that "it is solely within the ALJ's province to review the medical opinion evidence and resolve any conflicts." (*Id.* at 13, citing *Young v. Heckler*, 803 F.2d 963, 967 (9th Cir. 1986)) Accordingly, Defendant argues the ALJ was not only entitled to interpret the additional evidence, but that "the ALJ's interpretation of the evidence is entitled to deference." (*Id.*, citing *e.g., Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[I]f evidence is susceptible of more than one rational interpretation, the decision of the ALJ must be upheld")).

Notably, as Defendant argues, "it is the ALJ's province to review and evaluate the evidence as a whole." *Martin v. Berryhill*, 2017 WL 1064653 at *7 (E.D. Cal. Mar. 17, 2017) (citing *Magallanes v.*

13

*Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *see also Gonzalez v. Astrue*, 2012 WL 14002 at *8 (E.D. Cal. Jan. 4, 2012 ("It is the province of the ALJ to assess the medical evidence, provide an interpretation thereof, and resolve any conflicts or ambiguities that exist.") On the other hand, "an ALJ, as a layperson, is not qualified to interpret raw data in a medical record." *See Manso-Pizarro v. Secretary of Health and Human Services*, 76 F.3d 15, 17 (1st Cir. 1996). Here, however, the additional records provided to the ALJ did not include raw data that required medical interpretation. Rather, the psychiatric treatment notes included Plaintiff's subjective complaints, observations by the nurse practitioner and physicians, and the treatment plans. (*See generally* Doc. 13-14) Thus, the ALJ was entitled to review and interpret this evidence.

Because the record before the ALJ was not inadequate for a decision to be made, a duty to further develop the record was not triggered. *See Thomas v. Barnhart*, 278 F.3d 947, 978 (9th Cir. 2002) (duty not triggered when the medical report was adequate to make a disability determination); *Mayes*, 267 F.3d at 459-60.

## B. Evaluation of the Medical Record

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by

14

substantial evidence in the record." *Id.*, 81 F.3d at 830.

### 1. GAF scores as medical opinions

As an initial matter, the parties disagree regarding whether Plaintiff's treating psychiatrists offered medical opinions that the ALJ was obligated to evaluate. Plaintiff argues Drs. Santy and Akhbarati opined he was "seriously impaired," and "expressed their opinions by assigning Plaintiff GAF scores of 48." (Doc. 22 at 13-14) Plaintiff contends the ALJ erred because he "failed to even acknowledge the GAF scores assigned by Plaintiff's treating psychiatrists, much less give reasons for rejecting them." (*Id.* at 14) On the other hand, Defendant argues GAF scores are not medical opinions within the meaning of the Regulations. (Doc. 33 at 16; citing 20 C.F.R. § 404.1527(a)(1); *Kelly*

In the Regulations, the Social Security Administration asserts it "will evaluate every medical opinion we receive," and defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including… symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Thus, an ALJ has an obligation to consider statements by physicians regarding a claimant's symptoms, diagnoses, and his prognosis. *See id.*

Significantly, the Ninth Circuit observed: "Although GAF scores alone do not measure a patient's ability to function in a work setting, [citation] the Social Security Administration (SSA) has endorsed their use as evidence of mental functioning for a disability analysis." *Craig v. Colvin*, 659 Fed. App'x 381, 382 (9th Cir. 2016), citing SSA Administrative Message 13066 (effective July 22, 2013). Accordingly, the Court determined an ALJ may rely in part upon GAF scores "as a method of quantifying treatment physicians' qualitative assessments of [a claimant's] overall functioning." *Id.* However, an ALJ may "not use [a] GAF score as an isolated measure of [a claimant's] ability to perform work. *Id.*

Previously, this Court observed: "While [a] GAF score does not provide detailed information, it is nonetheless a statement that reflects a physician's judgment about the nature or severity of a patient's current condition. Thus, a GAF score assigned by a physician is a medical opinion about the level of the patient's functioning at that time." *Hinojos v. Astrue*, 2012 U.S. Dist. LEXIS 182787 (E.D. Cal.

Dec. 28, 2012), citing, e.g., *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential … [and] the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."). Given the limited probative value, "an ALJ has no obligation to credit or even consider GAF scores in the disability determination." *Holcomb v. Colvin*, 2015 U.S. Dist. LEXIS 33036 (Mar. 17, 2015) (citation omitted). Thus, the Court finds the ALJ did not err by failing to evaluate GAF scores as medical opinions.

### 2. Failure to discuss probative evidence

The Ninth Circuit determined that "in interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence." *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (internal quotations omitted). Rather, the ALJ must explain only "why significant probative evidence has been rejected." *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984); *see also Flores v. Shalala,* 49 F.3d 562, 570-71 (9th Cir. 1995) (the ALJ "may not reject significant probative evidence without explanation").

Plaintiff contends the ALJ erred in evaluating the treatment notes, which "showed Plaintiff's mental functioning was seriously impaired by his psychosis." (Doc. 22 at 13) Plaintiff observes: "According to the treatment records the ALJ reviewed, Plaintiff did not have just a 'History of Psychosis,' but was diagnosed with Major Depressive Disorder, Recurrent, Severe with Psychotic Features [citation]. Plaintiff's treating psychiatrists observed on several occasions that he was responding to internal stimuli [and] opined he was 'clearly psychotic.'" (*Id.* at 12, citations omitted) Indeed, a review of the ALJ's decision reveals that the ALJ primarily summarized Plaintiff's subjective complaints made to Ms. Salazar, Dr. Santy, and Dr. Akhbarati, but does not include the diagnoses made, observations of Plaintiff during the examinations, their findings regarding the effectiveness of the medication, or the treatment received. (*See* Doc. 13-9 at 18-19)

For example, on June 4, 2013, Dr. Santy observed that Plaintiff was "very withdrawn and responding to internal stimuli," appeared depressed, and exhibited suspicious, withdrawn behavior with poor eye contact. (Doc. 13-14 at 12) In addition, Dr. Santy opined Plaintiff exhibited motor retardation and "poverty of speech." (*Id.*) At that time, Plaintiff was diagnosed with "major depressive disorder,

recurrent, severe with psychotic features; and post-traumatic stress disorder. (*Id.*) At another visit, Dr. Santy observed that Plaintiff "was "somewhat disheveled and dirty," exhibiting suspicious and withdrawn behavior." (*Id.* at 8) Likewise, Dr. Akhabarti observed that Plaintiff's affect appeared flat, he had motor retardation, "poverty of thought," and withdrawn behavior. (*Id.* at 10) Further, she indicated Plaintiff was "clearly psychotic" and increased his medication. (*Id.* at 11) However, these observations and findings were not addressed by the ALJ.

Such probative evidence of an individual's mental functioning may not be ignored. *See,* 20 C.F.R. § 404.1527(a)(2); *see also, e.g., St. Clair v. Colvin*, 2014 WL 5421261 at *6, 208 Soc. Sec. Rep. Service 593 (W. Wash. Oct. 23, 2014) (finding the ALJ erred by failing to address "a number of independent observations, on multiple examinations, such as that plaintiff appeared unkempt, expressionless, and hostile" because they were "significant, probative observations that the ALJ should have discussed"). Accordingly, the ALJ erred through his failure to discuss the observations and findings of Drs. Santy, and Akhabarti in the treatment notes from Fresno County Behavioral Health.

**C.    Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be

17

credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834.

The ALJ failed to discuss significant and probative evidence from individuals who treated Plaintiff for his mental impairments. The Court is unable to find this error this was harmless, particularly in light of the prior remand that instructed the ALJ to obtain these treatment records and further evaluate the record. Accordingly, the matter should be remanded for the ALJ to re-evaluate the medical evidence related to Plaintiff's mental abilities during the closed period of disability. *See Moisa*, 367 F.3d at 886.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on these grounds, it offers no findings regarding the issues related to Plaintiff's physical impairments. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Dwayne Wilson and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **March 22, 2018**          **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE